UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

    Plaintiff,

v.                                         Case No. 10-20158

Amir Leonard,                    Honorable Sean F. Cox

    Defendant.

_____/

## OPINION
## FINDING DEFENDANT TO HAVE VIOLATED
## THE CONDITIONS OF HIS SUPERVISED RELEASE

On March 30, 2011, this Court held a supervised release violation hearing in this matter. As set forth below, the Court concludes that the Government has established, by a preponderance of the evidence, that Defendant committed a "Grade A" violation of his supervised release, in addition to the three "Grade C" supervised release violations that Defendant pleaded guilty to on March 30, 2011.

### BACKGROUND

In Case No. 04-00143, in the United States District Court for the Southern District of West Virginia, Charleston Division, Defendant Amir Leonard ("Defendant") pleaded guilty to Aiding and Abetting the Possession with Intent to Distribute 50 or More Grams of Cocaine Base, in violation of 21 U.S.C. § 841(a)(1), and was sentenced to 87 months imprisonment, followed by 5 years of supervised release. The sentencing court imposed standard conditions of

supervision.

Defendant was released from custody and commenced his term of supervised release on December 4, 2009. Defendant's supervised release was transferred to the Eastern District of Michigan on March 23, 2010, at which time this action was opened.

On January 27, 2011, Defendant's Probation Officer filed a "Petition for Warrant or Summons for Offender Under Supervision" ("the Petition"). (Docket Entry No. 2). The Government alleges that Defendant has violated four conditions of supervised release:

1. <u>Violation of Mandatory Condition:</u> "WHILE ON SUPERVISED RELEASE THE DEFENDANT SHALL NOT COMMIT ANOTHER FEDERAL, STATE, OR LOCAL CRIME."

2. <u>Violation of Standard Condition No. 1:</u> "THE DEFENDANT SHALL NOT LEAVE THE JUDICIAL DISTRICT WITHOUT THE PERMISSION OF THE COURT OR PROBATION OFFICER."

3. <u>Violation of Standard Condition No. 7:</u> "THE DEFENDANT SHALL REFRAIN FROM EXCESSIVE USE OF ALCOHOL AND SHALL NOT PURCHASE, POSSESS, USE, DISTRIBUTE, OR ADMINISTER ANY CONTROLLED SUBSTANCES OR ANY PARAPHERNALIA RELATED TO ANY CONTROLLED SUBSTANCES, EXCEPT AS PRESCRIBED BY A PHYSICIAN."

4. <u>Violation of Standard Condition No. 9:</u> "THE DEFENDANT SHALL NOT ASSOCIATE WITH ANY PERSONS ENGAGED IN CRIMINAL ACTIVITY AND SHALL NOT ASSOCIATE WITH ANY PERSON CONVICTED OF A FELONY, UNLESS GRANTED PERMISSION TO DO SO BY THE PROBATION OFFICER."

(*Id*.).

On March 1, 2011, the parties appeared before the Court. Defense Counsel confirmed that Defendant has received written notice of the alleged supervised release violations and that

he has the initial Presentence Report. Both the Government and Defense Counsel agreed to a March 30, 2011 hearing.

## SUPERVISED RELEASE REVOCATION HEARING

At the March 30, 2011 hearing, Defendant pleaded guilty to Violation No. 2 (leaving the judicial district without permission to do so), Violation No. 3 (testing positive for marijuana, a controlled substance), and Violation No. 4 (associating with a known convicted felon, without having been granted permission to do so). This Court accepted Defendant's guilty plea as to those three violations.

The Court then conducted an evidentiary hearing, to determine whether Defendant committed the remaining alleged supervised release violation – Violation No. 1 (committing another federal or state crime).

The Government called Special Agent Robert Negro as a witness at the evidentiary hearing. The Government presented eight exhibits at the hearing (Government's Exhibits 1 through 8), which consisted of one CD containing recordings of telephone calls and seven digital photographs.

Defendant did not present any witnesses. Defendant presented five exhibits at the hearing (Defendant's Exhibits 1 through 5), which consisted of five digital photographs.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Having heard and observed the witness who testified at the evidentiary hearing, allowing for this Court to assess credibility, having considered the exhibits submitted by the parties, having considered the arguments presented by counsel, and having applied the governing legal

principles, the Court makes the following findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

After consideration of the testimony and exhibits presented at the evidentiary hearing, drawing inferences as appropriate, weighing the evidence and assessing the credibility of the witnesses, the Court finds as follows.

Special Agent Robert Negro has worked for the federal Drug Enforcement Administration ("D.E.A.") since 1996 as a Special Agent criminal investigator. In April and May of 2010, Charleston, West Virginia was his assigned duty station. He has been there since 2002.

In April of 2010, Special Agent Negro was investigating an individual named Donnie Anderson in the Charleston area. Special Agent Negro had been contacted by a confidential informant who advised that Anderson was dealing Oxycontin pills.

Special Agent Negro, acting with the confidential informant, set up a controlled purchase of eight, 80-milligram Oxycontin pills. During that first transaction, the deal was conducted by a woman named Melissa Toon and Anderson was the individual who brought the pills for the delivery. The transaction took place at a Kroger grocery store parking lot in South Charleston, West Virginia.

Special Agent Negro, again acting with the assistance of his confidential informant, set up a second controlled purchase of Oxycontin pills directly from Anderson. It occurred at the same location with the same confidential informant.

---

[1] To the extent that a finding of fact is more properly a conclusion of law, and the to the extent that a conclusion of law is more properly a finding of fact, it should be so construed.

After that second controlled purchase, Special Agent Negro sought to try to arrange another controlled purchase with a larger quantity of pills from Anderson. The confidential informant told Anderson that he wanted to purchase approximately 100, 80-milligram Oxycontin pills. Anderson told the confidential informant that would be possible at a price of $50.00 per pill. Special Agent Negro spoke to the confidential informant on May 3, 2010 about his conversation with Anderson. Anderson told the confidential informant that he would be unavailable until Thursday or Friday of that week because he was traveling up to Michigan.

The confidential informant told Negro that he had seen Anderson on Sunday, May 2nd, at the tri-state dog track in Cross Lanes, West Virginia, and that Anderson was with an associate that went by the name "Nut." The man that went by the name Nut was subsequently identified by the confidential informant as Amir Leonard. In any event, the confidential informant advised Special Agent Negro that he knew Nut to be a criminal associate of Anderson's and that on May 2nd Nut had offered to supply up to 100, 80-milligram Oxycontin pills to him. Nut told the confidential informant that he would sell the pills to him for $40.00 each.

The plan was that the confidential informant would obtain the pills after Anderson returned from Detroit, on Thursday or Friday.

On Friday, May 7, 2010, Special Agent Negro met with the confidential informant, at which time the confidential informant placed a call to Anderson, which was recorded by Special Agent Negro. That call was placed to the same number that Anderson had been contacted at in connection with the previous controlled purchases. On this recorded call, the confidential informant called Anderson and Anderson stated that he was still in Detroit but he anticipated he would be able to come back with the pills in a few days.

5

The next day, Saturday, May 8, 2010, Special Agent Negro contacted his confidential informant, who had an unrecorded conversation with Anderson. During that conversation, Anderson said that he had already returned to West Virginia with the pills. Anderson said that he was now heading to Maryland to visit family, but that he would leave the pills with a female by the name of Keisha who would deliver them the following day.

Later that same evening, the confidential informant spoke to Anderson again, at which time Anderson told him that he would leave the pills with someone else. The confidential informant assured Anderson that he had the money for the 93 pills he was going to purchase.

On the morning of Sunday, May 9, 2010, Special Agent Negro and his confidential informant started making calls to coordinate delivery of the pills for around 5:00 p.m. that day. Although they had thought that a female would deliver the pills, during the afternoon of May 9th, they started getting telephone calls from a man, later identified as Amir Leonard, who said that he would be making the delivery.

During a recorded telephone call, the confidential informant and Defendant agreed to meet at the Kroger parking lot, at the River Walk Shopping Center in South Charleston, where the previous deliveries had been made to the confidential informant. Special Agent Negro set up surveillance at that location.

In another recorded telephone call made a few minutes later, Defendant told the confidential informant to come over to the Krispy Kreme donut shop, near to the Kroger grocery store, to meet him. At that time, Special Agent Negro saw Defendant standing in front of the Krispy Kreme donut shop.

Special Agent Negro then gave the signal to his officers to approach and arrest

Defendant.  A marked police car then entered the parking lot.  Upon seeing the marked police car, Defendant ran in to the Krispy Kreme donut shop at a very rapid pace.  Special Agent Negro ran after Defendant, along with several officers.

Once inside the donut shop, Defendant ran into the bathroom and locked the door. The officers announced that they were police officers and demanded that Defendant open the door.  Defendant did not respond to the officers or open the door.  While Defendant was inside the locked bathroom, Special Agent Negro could hear the toilet flushing several times – one flush right after another.

While Special Agent Negro remained at the locked door, another officer obtained a key to the bathroom from a store clerk.  By the time the officers got the door unlocked, Defendant was standing at the sink washing his hands.

Upon entering the bathroom, Special Agent Negro found plastic wrap in the trash can that had been torn open, which in Special Agent Negro's experience, is indicative of drug packaging.

Upon arresting Defendant, Special Agent Negro found Defendant in possession of approximately $1,600.00 in cash.  Defendant had a Michigan driver's license identifying him as Amir Leonard in his possession.  He also had a rental agreement for the Ford Fusion that Defendant drove to the site.  That car had been rented by Anderson.

Special Agent Negro conducted a criminal query on Defendant and learned that he had a prior federal conviction and that he was currently on supervised release in Michigan.  He also ran Defendant's name through databases, which reflect that Defendant uses the aliases of "Peanut" and "Nut."

The next day, Monday, May 10, 2010, Special Agent Negro spoke to a woman named Melissa Toon. Toon was the individual who had previously acted a middle-man to set up the confidential informant with Anderson. Special Agent Negro approached her at her residence and told her that he believed she was involved in drug trafficking. Toon told Special Agent Negro that it had been her first time being involved in such a thing and that she wanted to cooperate with the police. Special Agent Negro left her his business card.

Toon came to see Special Agent Negro the following day, May 11, 2010. Toon gave a video-taped statement, indicating that she met Anderson about five months prior, at the Red Carpet Lounge, on the east end of Charleston, West Virginia. Anderson was with Defendant when Toon met Anderson. Toon stated that she had a romantic relationship with Anderson and that she knew he was involved in the distribution of Oxycontin. Toon further stated that she had seen Anderson use lots of different rental cars and that he frequently traveled between Detroit and West Virginia.

Toon also stated that she knew Defendant to be a criminal associate of Anderson's, that Defendant had an Oxycontin source in Detroit, and that Defendant made trips to pick up Oxycontin for distribution in the West Virginia area.

Toon stated that after Defendant had been arrested, and prior to her conversation with Special Agent Negro, she talked to Anderson. Anderson told her that he lost a substantial quantity of drugs that had been flushed down the toilet before being intercepted by the police.

Toon told Special Agent Negro that the rented Ford Fusion that Defendant had been driving on the date he was arrested was the same car that she had seen Anderson operate on other occasions – including the two prior controlled purchases that the confidential informant had done

8

with Toon and Anderson.

## CONCLUSIONS OF LAW

Here, the Government has charged Defendant with four separate violations of his supervised release. As set forth in § 7B1.1 of the United States Sentencing Guidelines, there are three grades of probation and supervised release violations:

> (1) <u>Grade A Violations</u> – conduct constituting (A) federal, state, or local offense punishable by a term of imprisonment exceeding one year that (i) is a crime of violence, (ii) is a controlled substance offense, or (iii) involves possession of a firearm or destructive device of a type described in 26 U.S.C. § 5845(a); or (B) any other federal, state, or local offense punishable by a term of imprisonment exceeding twenty years;
>
> (2) <u>Grade B Violations</u> – conduct constituting any other federal, state, or local offense punishable by a term of imprisonment exceeding one year;
>
> (3) <u>Grade C Violations</u> – conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment of one year or less; or (B) a violation of any other condition of supervision.

U.S.S.G. § 7B1.1(a)(1). Where there is more than one violation of the conditions of supervision, or the violation includes conduct that constitutes more than one offense, the grade of the violation is determined by the violation having the most serious grade. U.S.S.G. § 7B1.1(b).

Defendant is alleged to have committed both Grade A and Grade C supervised release violations. As stated supra, Defendant pleaded guilty to three Grade C supervise release violations – Violations No. 2, 3 & 4.

Thus, the Court must determine whether Defendant also committed a Grade A violation of his supervised release.

The Court's disposition of the matter is governed by 18 U.S.C. § 3583. FED. R. CRIM. P.

9

32.1(d).  Under § 3583(e)(3), a district court may revoke a term of supervised release if it finds "by a **preponderance of the evidence** that the defendant violated a condition of supervised release."  18 U.S.C. § 3583(e)(3) (emphasis added); *United States v. Webb*, 30 F.3d 687, 688-89 (6th Cir. 1994).  "The preponderance standard requires a lesser quantum of proof and enables the trier of fact to make a determination of guilt that it could not make if the standard were that at trial, i.e., guilt beyond a reasonable doubt."  *United States v. Thompson*, 314 Fed.Appx. 797, 2008 WL 4899459 (6th Cir. 2008).

Moreover, it is "well-settled that hearsay may be considered in a supervised release revocation hearing if it is shown to be reliable."  *United States v. Williams*, 214 Fed.Appx. 552, 555 (6th Cir. 2007) (citing *United States v. Kirby*, 418 F.3d 621, 626-27 (6th Cir. 2005).  The Court concludes that the hearsay evidence presented at the evidentiary hearing was shown to be sufficiently reliable.

The Government contends that Defendant committed a Grade A violation because, as alleged with respect to Violation No. 1,  he committed a federal, state or local offense.  Specifically, the Government contends that the evidence establishes that Defendant's actual conduct constituted unlawful possession of, with intent to distribute, Oxycontin pills, in violation of 21 U.S.C. §841.

"To convict a person of possession with intent to distribute oxycontin, the government must prove: (1) the defendant knowingly, (2) possessed oxycontin, (3) with intent to distribute it."  *United States v. Gregory*, 311 Fed.Appx. 848, 859 (6th Cir. 2009).

Circumstantial evidence alone can be sufficient to sustain a conviction.  *United States v. Ellzey,* 874 F.2d 324, 328 (6th Cir. 1989).

Possession may be either actual or constructive. Actual possession exists when a tangible object is in the immediate possession or control of a person. *United States v. Wright*, 329 Fed.Appx. 615, 619 (6th Cir. 2009).

Intent to distribute drugs can be inferred from circumstantial evidence of the possession of large quantities of drugs. *United States v. Young*, 243 Fed.Appx. 105, 106 (6th Cir. 2007).

The Court concludes that the Government has established, by a preponderance of the evidence, that Defendant's actual conduct constituted unlawful possession of, with intent to distribute, Oxycontin pills. That evidence includes the following. Defendant offered to sell a large quantity of Oxycontin pills to the confidential informant. Defendant arranged to meet the confidential informant at a mutually agreed upon location to deliver the pills. Upon seeing a marked police car enter the parking lot at the agreed upon location, Defendant ran into the donut shop's bathroom and locked the door. Despite the police identifying themselves and demanding that Defendant open the door, Defendant ignored their demands and proceeded to flush the toilet several times – one flush right after another. Upon entering the bathroom, Special Agent Negro found torn up plastic wrap, indicia of drug packaging, in the trash can. Moreover, at the time of his arrest, Defendant had approximately $1,600.00 in cash on him and was driving Anderson's rental car – the same rental car that Anderson had used in two previous controlled purchases of Oxycontin.

## CONCLUSION

For the reasons set forth above, the Court finds that the Government has established, by a preponderance of the evidence, that Defendant committed a "Grade A" violation of supervised release, along with three "Grade C" violations of supervised release. Sentencing shall be on

April 27, 2011 at 2:00 p.m.

                                              S/Sean F. Cox
                                              Sean F. Cox
                                              United States District Judge

Dated: April 4, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 4, 2011, by electronic and/or ordinary mail.

                                              S/Jennifer Hernandez
                                              Case Manager